1

2

3

4

5

6

7

8              IN THE UNITED STATES DISTRICT COURT

9            FOR THE EASTERN DISTRICT OF CALIFORNIA

10

11 JESUS CHRIST PRISON                  No.  CIV.S-05-0440 DAD
   MINISTRY, et al.,
12
            Plaintiffs,
13
       v.                                    ORDER
14
   CALIFORNIA DEPARTMENT OF
15 CORRECTIONS, et al.,

16          Defendants.
   _____/
17

18         Upon consent of the parties, this action has been assigned

19 to the undersigned for all proceedings.  See 28 U.S.C. § 636(c).  It

20 is before the court on the parties' cross-motions for summary

21 judgment.  For the reasons explained below, those motions will be

22 granted in part and denied in part.

23                           **BACKGROUND**

24         Plaintiffs initiated this civil rights action by filing

25 their verified complaint on March 3, 2005.  The named plaintiffs are

26 Jesus Christ Prison Ministry ("JCPM") and state prisoners Daniel

                                1

Leffel, Marvin Salinas, and Daniel Marchy.  The named defendants are the California Department of Corrections (now the California Department of Corrections and Rehabilitation ("CDCR")); Jeane S. Woodford (Director of CDCR); and Derral G. Adams (Warden of California State Substance Abuse Treatment Facility ("SATF") in Corcoran, California).

The verified complaint contains three causes of action. The first cause of action is brought only by the prisoner plaintiffs against all defendants.  It alleges that SATF's policy prohibiting the sending of free softbound, Christian literature, compact discs and tapes to prisoners who have requested those materials violates the Religious Land Use and Institutionalized Persons Act of 2000 ("RLUIPA").

The second cause of action is brought by plaintiff JCPM and the plaintiff prisoners against all defendants.  It alleges that defendants' actions deprive both JCPM and the prisoners of the free exercise of religion in violation of the First and Fourteenth Amendments.

The third cause of action is brought by JCPM and the prisoners against all defendants.  It alleges that defendants' actions deprive JCPM and the prisoners of their right to free speech in violation of the First and Fourteenth Amendments.

The complaint prays for injunctive relief, declaratory relief, nominal damages and reasonable attorney fees and costs. However, plaintiffs withdrew their request for nominal damages at the hearing on the cross-motions for summary judgment.

1    After settlement negotiations proved unsuccessful, the

2    parties were directed to file cross-motions for summary judgment.

3    Those motions came on for hearing on April 21, 2006.  Kevin T. Snider

4    of the Pacific Justice Institute appeared on behalf of plaintiffs.

5    John W. Riches, II, Deputy Attorney General, appeared on behalf of

6    defendants.

7                                **LEGAL STANDARDS**

8    Summary judgment is appropriate when it is demonstrated

9    that there exists no genuine issue as to any material fact, and that

10   the moving party is entitled to judgment as a matter of law.  Fed. R.

11   Civ. P. 56(c); see also Adickes v. S.H. Kress & Co., 398 U.S. 144,

12   157 (1970); Owen v. Local No. 169, 971 F.2d 347, 355 (9th Cir. 1992).

13               The party moving for summary judgment
                 always bears the initial responsibility of
14               informing the district court of the basis for its
                 motion, and identifying those portions of "the
15               pleadings, depositions, answers to
                 interrogatories, and admissions on file, together
16               with the affidavits, if any," which it believes
                 demonstrate the absence of a genuine issue of
17               material fact.

18   Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).

19               "[W]here the nonmoving party will bear the burden of proof

20   at trial on a dispositive issue, a summary judgment motion may

21   properly be made in reliance solely on the 'pleadings, depositions,

22   answers to interrogatories, and admissions on file.'"  Celotex Corp.,

23   477 U.S. at 323.  Indeed, summary judgment should be entered, after

24   adequate time for discovery and upon motion, against a party who

25   fails to make a showing sufficient to establish the existence of an

26   element essential to that party's case, and on which that party will

                                     3

bear the burden of proof at trial.  <u>See</u> <u>id.</u> at 322.  "[A] complete

failure of proof concerning an essential element of the nonmoving

party's case necessarily renders all other facts immaterial."  <u>Id.</u>

In such a circumstance, summary judgment should be granted, "so long

as whatever is before the district court demonstrates that the

standard for entry of summary judgment, as set forth in Rule 56(c),

is satisfied."  <u>Id.</u> at 323.

If the moving party meets its initial responsibility, the

burden then shifts to the opposing party to establish that a genuine

issue as to any material fact actually does exist.  <u>Matsushita Elec.</u>

<u>Indus. Co. v. Zenith Radio Corp.</u>, 475 U.S. 574, 586 (1986); <u>see</u> <u>also</u>

<u>First Nat'l Bank of Ariz. v. Cities Serv. Co.</u>, 391 U.S. 253, 288-89

(1968); <u>Ruffin v. County of Los Angeles</u>, 607 F.2d 1276, 1280 (9th

Cir. 1979).  The opposing party must demonstrate that the fact in

contention is material, i.e., a fact that might affect the outcome of

the suit under the governing law, and that the dispute is genuine,

i.e., the evidence is such that a reasonable jury could return a

verdict for the nonmoving party.  <u>Anderson v. Liberty Lobby, Inc.</u>,

477 U.S. 242, 248 (1986); <u>T.W. Elec. Serv., Inc. v. Pacific Elec.</u>

<u>Contractors Ass'n</u>, 809 F.2d 626, 630 (9th Cir. 1987).  Thus, the

"purpose of summary judgment is to 'pierce the pleadings and to

assess the proof in order to see whether there is a genuine need for

trial.'"  <u>Matsushita</u>, 475 U.S. at 587 (quoting Fed. R. Civ. P. 56(e)

advisory committee's note on 1963 amendments).

In resolving the summary judgment motion, the court

examines the pleadings, depositions, answers to interrogatories, and

admissions on file, together with the affidavits, if any.  Rule

56(c); see also SEC v. Seaboard Corp., 677 F.2d 1301, 1305-06 (9th

Cir. 1982).  The evidence of the opposing party is to be believed,

Anderson, 477 U.S. at 255, and all reasonable inferences that may be

drawn from the facts placed before the court must be drawn in favor

of the opposing party.  Matsushita, 475 U.S. at 587 (citing United

States v. Diebold, Inc., 369 U.S. 654, 655 (1962)); see also United

States v. First Nat'l Bank of Circle, 652 F.2d 882, 887 (9th Cir.

1981).  Nevertheless, inferences are not drawn out of the air, and it

is the opposing party's obligation to produce a factual predicate

from which the inference may be drawn.  See Richards v. Nielsen

Freight Lines, 602 F. Supp. 1224, 1244-45 (E.D. Cal. 1985), aff'd,

810 F.2d 898, 902 (9th Cir. 1987).

        Finally, "[a] scintilla of evidence or evidence that is

merely colorable or not significantly probative does not present a

genuine issue of material fact" precluding summary judgment.  Addisu

v. Fred Meyer, Inc., 198 F.3d 1130, 1134 (9th Cir. 2000).  See also

Summers v. Teichert & Son, Inc., 127 F.3d 1150, 1152 (9th Cir. 1997).

On summary judgment the court is not to weigh the evidence or

determine the truth of the matters asserted but must only determine

whether there is a genuine issue of material fact that must be

resolved by trial.  See Summers, 127 F.3d at 1152.  Nonetheless, in

order for any factual dispute to be genuine, there must be enough

doubt for a reasonable trier of fact to find for the plaintiff in

order to defeat a defendant's summary judgment motion.  See Addisu,

198 F.3d at 1134.

**FACTS**[1]

Plaintiff JCPM is a religious organization that provides predominately softbound Christian literature, free of charge, to incarcerated individuals in several states. These religious materials are provided only to prisoners who specifically request them. JCPM sends written materials to incarcerated persons based on its sincerely held religious beliefs. Plaintiffs Daniel Leffel, Marvin Salinas and Daniel Marchy are sincere adherents of the Christian faith and are confined at SATF.

In accordance with their religious beliefs, plaintiffs Leffel, Salinas and Marchy seek to reform their behavior and attitudes through religious exercise. At the core of that religious exercise is studying the Bible. Another important aspect of plaintiffs' exercise of their religion is worshiping and meditating on God through music. To study the Bible, the plaintiff prisoners need Christian literature that explains biblical theology, doctrine and Christian concepts. To worship and meditate on God through music, plaintiffs require compact discs and/or tape recordings of Christian music.

To engage in this exercise of religion, the prisoners correspond with charitable religious organizations offering spiritual assistance through free study materials. The plaintiff prisoners are indigent and thus unable to purchase Christian literature, tapes and

---

[1] Unless otherwise noted, the facts set forth in this section are the undisputed facts material to the disposition of the motions. Many of these facts have been adopted from the parties' statements of undisputed facts.

compact discs.  The prisoners rely on charitable religious

organizations to send them free religious materials when requested in

writing.  Those materials include softbound books, unbound study

guides and pamphlets as well as sermons and Christian music on audio

tapes and compact discs.  The plaintiff prisoners sincerely believe

their religious exercise, through the regular use of such religious

materials, has encouraged their conformity with prison guidelines

regarding appropriate behavior.

While incarcerated at SATF, plaintiff Salinas was sent

softbound printed religious materials from JCPM free of charge.

Plaintiffs Leffel and Marchy were sent materials from other

ministries.  Although plaintiffs had received these materials

previously, pursuant to a new policy instituted in March or April of

2004 at SATF, prison officials began denying plaintiffs these

religious materials because the literature was not sent from an

"approved vendor" and was thus considered contraband.  (Defs.'

Statement of Undisp. Facts, Ex. E at 8.)  In response to the decision

in Prison Legal News v. Lehman, 397 F.3d 692 (9th Cir. 2005), CDCR

Deputy Director Suzan L. Hubbard issued a memorandum on April 5, 2005

directing all institutions to process and permit incoming "non-

subscription bulk mail and catalogs" addressed to individual

prisoners.  (Defs.' Statement of Undisp. Facts, Ex. A, Attach. 3.)

Effective March 1, 2006, this policy implementation was changed yet

again.  (Id. at Ex. A, Attach. 2 and Ex. B.)  Thus, during the period

of time relevant to this action the policies at SATF with respect to

/////

the processing of religious materials sent to the plaintiff prisoners via the mail have changed three times.

Currently, and pursuant to the various policy changes noted above, the manner of processing mail depends on which of three categories the mail falls into. The first category is properly addressed unbound study guides, pamphlets, and other religious literature. This category of mail is no longer to be subject to the approved vendor policy and is to be delivered directly to the prisoner from the SATF mailroom.

The second category is softbound books (such as a Bible) from a publisher, bookstore, or other organization which does mail order business. The SATF mailroom considers plaintiff JCPM to be an organization conducting a mail order business, although the term "mail order business" has not been defined in connection with the motions pending before the court. Upon receipt by the SATF mailroom, properly addressed softbound books are to be forwarded to receiving and release ("R&R") for processing. The R&R softbound book processing consists of opening and inspecting the package; entering the contents of the package on the prisoner's property inventory card; and sending the package to the prisoner. This second category of materials is also no longer intended to be subject to the approved vendor policy.

The third category of mail consists of audio tapes and compact discs. These materials remain subject to the approved vendor policy. The details of the current approved vendor policy are set

/////

forth in Operational Procedure 129 ("OP-129"), governing prisoner mail at SATF.  According to OP-129:

> Inmates are allowed to receive religious books/materials directly from authorized religious vendors through Special Purchases or through the quarterly packages by approved vendors as listed in OP 201.  All materials must be sealed in the manufacturer's wrapping and accompanied with a purchasing order/invoice.

(Defs.' Statement of Undisp. Facts, Ex. A, Attach. 2 at 5.)  There are only six approved vendors at SATF: Walkenhorst's; Union Supply Company, Inc.; Music by Mail; Access Company; Pack Central; and Amazon.com.  (Defs.' Statement of Undisp. Facts, Ex. E at 8.)  In short, the approved vendor policy allows prisoners to receive tape recordings and compact discs from only a handful of specifically identified approved vendors and only so long as the materials are in their original wrapping and are accompanied by a purchase receipt. Once tape recordings and compact discs are received in the mailroom from an approved vendor, they are forwarded to R&R and processed accordingly.  Plaintiff JCPM is not an approved vendor.  It is a non-profit religious organization that donates, rather than sells, its materials which are not always unused.  Therefore, its religious materials do not come with a purchase order and they are not wrapped in packaging.

Finally, tape recordings and compact discs with religious content may also be donated to the institution, but not to prisoners directly, pursuant to a gifts and donations operations procedure. Under that procedure, a chaplain prepares an authorization form based on information provided by the donor of the religious materials.

Once the donation is approved, the donation will be accepted on
behalf of SATF.  Upon delivery of the donation, it is subject to
review and inspection for safety and security purposes.  Once the
donation has been reviewed and inspected, it is held and made
available to prisoners through the chaplain on a check out basis.  A
prisoner may check out a donated item and keep it in his housing unit
for a specified period, usually two weeks.  Donated materials are not
subject to the restrictions on the amount of property allowed in a
prisoner's cell because they are technically held by the chaplain.
If the donated item is an audio tape or compact disc that has been
removed from the manufacturer's original packaging, the item will be
reviewed for content prior to being made available to prisoners.  The
institution's R&R officers are not involved in this donation process.

In sum, the undisputed facts establish that unbound study
guides, pamphlets, softbound books such as Bibles and other
literature sent by JCPM to SATF prisoners requesting those materials
are currently to be delivered to the prisoners following some sort of
inspection for safety purposes.  Tape recordings and compact discs
sent to SATF prisoners are delivered following inspection only if
they are from one of the six approved vendors.  Because JCPM is not
an approved vendor, and does not qualify as such under the policy, it
cannot send religious tape recordings and compact discs to the
plaintiff prisoners or to other prisoners at SATF.

/////

/////

/////

**ANALYSIS**

I.   **Threshold Issues**

Before turning to the merits of plaintiffs' claims the court must address a myriad of issues presented by the parties in the pending motions.  First, the scope of this action must be addressed. It is clear that JCPM would prefer to determine its free exercise and free speech rights in relation to SATF as well as every other CDCR institution through this lawsuit.  However, plaintiffs' verified complaint makes no mention of any other institution other than SATF. The "Nature of Action" alleged at the outset of the complaint mentions only SATF and its warden, Warden Adams.  (Compl. at 2.)  No other warden from any other institution is named or mentioned in the complaint.  The only individual plaintiffs are SATF prisoners and no prisoners from other institutions are mentioned in the complaint. The mail policies alleged in the complaint are those of SATF, not any other institution.  (Compl. at 3-4.)  Finally, the only suggestion that this action encompasses CDCR institutions statewide is the fact that CDCR and Director Woodford are named defendants.  The fact that those named defendants have statewide responsibilities as a general matter does not transform this action into one encompassing all CDCR institutions.  The court finds that the scope of this lawsuit is limited to the civil rights of plaintiff JCPM and the individual plaintiffs in relation to the policies and practices at SATF only.

Plaintiffs' complaint does clearly encompass claims by the individual plaintiffs that defendants have unlawfully prohibited religious organizations other than JCPM from sending them religious

1   materials.  However, the record in this regard has not been

2   sufficiently developed.  The only evidence addressing the issue of

3   the treatment of mail from religious organizations other than JCPM is

4   a declaration from plaintiff Leffel indicating he was declined a

5   "package" from "Bible Pathway Ministries" because it was not an

6   approved vendor and the declaration from plaintiff Marchy stating he

7   was denied "materials" from "Gospel Echoes Team" and "Fairhaven Bible

8   Church" because they did not appear on the approved vendors list.

9   (Decl. of Daniel Marchy in Supp. of Mot. for Summ. J. at 2-3; Decl.

10  of Daniel Leffel in Supp. of Mot. for Summ. J. at 2-3.)  While this

11  record raises an issue regarding the individual plaintiffs' ability

12  to receive religious materials from other organizations, the evidence

13  with respect to the nature of these other organizations and the

14  religious materials they desire to send to the plaintiffs at SATF is

15  scant.  Absent additional evidence, these issues are not ripe for

16  resolution on summary judgment.  Therefore, plaintiffs' motion for

17  summary judgment will be denied in this regard.  See Chao v.

18  Bremerton Metal Trades Council, AFL-CIO, 294 F.3d 1114, 1124 (9th

19  Cir. 2002) ("The district court erred in granting summary judgment in

20  favor of the Bremerton Council on this limited record.  A deeper

21  record on relevant issues is necessary to determine whether the

22  qualification was reasonable in all the circumstances."); Pepper &

23  Tanner, Inc. v. Shamrock Broadcasting, Inc., 563 F.2d 391, 396 (9th

24  Cir. 1977).

25       Next, defendants argue that this action is moot with

26  respect to the written materials because prisoners at SATF may now

receive all softbound books, unbound study guides, pamphlets and other literature from JCPM since those materials are no longer subject to the approved vendor policy.  Defendants assert the issues with respect to these written materials are no longer "live" and the parties therefore "lack a legally cognizable interest" in the outcome of this action.  See County of Los Angeles v. Davis, 440 U.S. 625, 631 (1979); Sample v. Johnson, 771 F.2d 1335, 1338 (9th Cir. 1985). Defendants' argument is unpersuasive.

"Mere voluntary cessation of allegedly illegal conduct does not moot a case[.]"  United States v. Concentrated Phosphate Export Ass'n, 393 U.S. 199, 203 (1968).  The party asserting mootness has a heavy burden of demonstrating that "subsequent events have made it absolutely clear that the allegedly wrongful behavior cannot reasonably be expected to recur and (2) interim relief or events have completely and irrevocably eradicated the effects of the alleged violation."  Norman-Bloodsaw v. Lawrence Berkeley Laboratory, 135 F.3d 1260, 1274 (9th Cir. 1998)(internal quotations, alterations and citations omitted).  See also Demery v. Arpaio, 378 F.3d 1020, 1026 (9th Cir. 2004); Fed. Trade Comm'n v. Affordable Media, LLC, 179 F.3d 1228, 1238 (9th Cir. 1999).  Here, defendants have failed to meet this heavy burden.

As set forth above, the mail policies implicated by this action have been changed by officials at SATF three times in the last two years.  In so doing, defendants have created somewhat of a "moving target" accompanied by no concrete assurances that the policies in question will not be subject to further modification and

13

change.  Indeed, with respect to the 2005 Hubbard memorandum, the

most defendants can muster is the noncommittal statement by Warden

Adams that "I am unaware of any intent to rescind this directive."

(Defs.' Statement of Undisp. Facts, Ex. A at 2.)  Such vague

representations do not make it absolutely clear that the allegedly

wrongful behavior cannot reasonably be expected to recur and

therefore those representations do not establish mootness.  See Halet

v. Wend Inv. Co., 672 F.2d 1305, 1308 (9th Cir. 1982)("This court

cannot rely on Wend's statement alone.  Wend could revert to an

adults-only policy in the future, and Wend has not demonstrated that

there is no reasonable expectation of such an occurrence.")  Finally,

plaintiffs have presented evidence that despite the changes in

policy, written materials from plaintiff JCPM and similar non-profit

religious organizations continue to be rejected pursuant to the

approved vendor policy.  (Declaration of Kevin Snider, Exs. 6-8.)

For these reasons, defendants' mootness argument will be rejected.

Another preliminary matter is CDCR Director Woodford's

contention that she is entitled to summary judgment in her favor

because there has been no showing that she was personally involved in

formulating the mail policies at SATF.  The court agrees.

Supervisory personnel such as defendant Woodford are not liable under

§ 1983 for the actions of their employees under a theory of

respondeat superior.  Therefore, when a named defendant holds a

supervisory position, a causal link between the defendant and the

claimed constitutional violation must be shown.  See Fayle v.

Stapley, 607 F.2d 858, 862 (9th Cir. 1979); Mosher v. Saalfeld, 589

1  F.2d 438, 441 (9th Cir. 1978).  "A supervisor is only liable for

2  constitutional violations of his subordinates if the supervisor

3  participated in or directed the violations, or knew of the violations

4  and failed to act to prevent them."  Taylor v. List, 880 F.2d 1040,

5  1045 (9th Cir. 1989)(citing Ybarra v. Reno Thunderbird Mobile Home

6  Village, 723 F.2d 675, 680-81 (9th Cir. 1984)).  A supervisor may be

7  liable upon a showing that he or she "implement[ed] a policy so

8  deficient that the policy 'itself is a repudiation of constitutional

9  rights' and was 'the moving force of the constitutional violation.'"

10  Redman v. County of San Diego, 942 F.2d 1435, 1446-47 (9th Cir.

11  1991)(citations omitted).

12          Here, plaintiffs' verified complaint contains no

13  allegations specific to defendant Woodford.  It is not seriously

14  disputed that prison regulations provide that wardens are responsible

15  for the operational procedure governing prisoners' mail at their

16  respective institutions.  (See Defs.' Cross-mot. at 6.)  OP-129, the

17  internal procedure governing the handling of prisoner mail at SATF,

18  specifically provides that "[t]he Warden is responsible for the

19  overall operation of this procedure."  (Defs.' Statement of Undisp.

20  Facts, Attach. 2 at 1.)  While the 2005 memorandum from Deputy

21  Director Hubbard, which directed CDCR institutions to process and

22  permit incoming non-subscription bulk mail and catalogs, was not

23  authored by a warden, it also was not written by defendant Woodford.

24  No evidence before the court suggests Director Woodford's personal

25  involvement in the issuing of that memorandum or in any other changes

26  in mail policies at SATF.  Based on this evidence, the court finds

15

1  that there is no genuine issue as to whether defendant Woodford was

2  personally involved in imposing the mail policies at issue or was a

3  moving force behind those policies.  Accordingly, defendant Woodford

4  is entitled to summary judgment in her favor.

5          Next, defendant CDCR asserts that as an arm of the state it

6  is not a "person" under 42 U.S.C. § 1983 and therefore not a proper

7  party to this action.  It is true that state agencies and state

8  officials acting in their official capacities are not "persons" for

9  purposes of a § 1983 suit seeking monetary damages.  See Arizonans

10 for Official English v. Arizona, 520 U.S. 43, 69 n.24 (1997); Will v.

11 Michigan Dep't. Of State Police, 491 U.S. 58, 71 (1989).  However,

12 state agencies and officials sued in their official capacities for

13 injunctive relief are persons for purposes of § 1983.  See Will, 491

14 U.S. at 71, n.10; Bank of Lake Tahoe v. Bank of America, 318 F.3d

15 914, 918 (9th Cir. 2003).  As noted above, plaintiffs have withdrawn

16 their request for nominal damages and currently seek declaratory and

17 injunctive relief only.  Therefore, defendant CDCR's argument that it

18 is not a proper party to this action must be rejected.

19         Because plaintiffs have withdrawn their request for

20 monetary damages, the court also rejects defendants' claim of

21 entitlement to qualified immunity.  Qualified immunity shields an

22 official from liability for civil damages only; it does not apply to

23 injunctive or declaratory relief.  Hydrick v. Hunter, 449 F.3d 978,

24 992 (9th Cir. 2006); American Fire, Theft & Collision Managers, Inc.

25 v. Gillespie, 932 F.2d 816, 818 (9th Cir. 1991); Backlund v.

26 Barnhart, 778 F.2d 1386, 1389 n.3 (9th Cir. 1985).

1    Finally, defendants argue that plaintiffs Leffel and

2    Salinas failed to exhaust their administrative remedies prior to

3    initiating this action.[2]  Therefore, in addition to moving for

4    summary judgment, defendants have moved to dismiss the claims of

5    plaintiffs Leffel and Salinas's without prejudice.  For the reasons

6    explained below, defendants' motion to dismiss will be denied.

7    By the Prison Litigation Reform Act of 1995 ("PLRA"),

8    Congress amended 42 U.S.C. § 1997e to provide that "[n]o action shall

9    be brought with respect to prison conditions under section 1983 of

10   this title, or any other Federal law, by a prisoner confined in any

11   jail, prison, or other correctional facility until such

12   administrative remedies as are available are exhausted."  42 U.S.C. §

13   1997e(a).  The exhaustion requirement "applies to all inmate suits

14   about prison life, whether they involve general circumstances or

15   particular episodes, and whether they allege excessive force or some

16   other wrong."  Porter v. Nussle, 534 U.S. 516, 532 (2002).

17   The Supreme Court has ruled that exhaustion of prison

18   administrative procedures is mandated regardless of the relief

19   offered through such procedures.  Booth v. Churner, 532 U.S. 731, 741

20   (2001).  The Court has also cautioned against reading futility or

21   other exceptions into the statutory exhaustion requirement.  Id. at

22   741 n.6.  Because proper exhaustion is necessary, a prisoner cannot

23   satisfy the PLRA exhaustion requirement by filing an untimely or

24   otherwise procedurally defective administrative grievance or appeal.

25

26   [2] It is undisputed that plaintiff Marchy exhausted his
     administrative remedies.

17

1  Woodford v. Ngo, ___ U.S. ___, 126 S. Ct. 2378, 2387 (2006).

2  Prisoners must exhaust administrative remedies before submitting any

3  papers to the federal courts.  Vaden v. Summerhill, 449 F.3d 1047,

4  1048, 1051 (9th Cir. 2006); McKinney v. Carey, 311 F.3d 1198, 1200-01

5  (9th Cir. 2002).

6       In California, state regulations permit prisoners to appeal

7  "any departmental decision, action, condition, or policy which they

8  can demonstrate as having an adverse effect upon their welfare."

9  Cal. Code Regs. tit. 15, § 3084.1(a).  Most appeals progress from an

10  informal review through three formal levels of review.  See Cal. Code

11  Regs. tit. 15, § 3084.5.  A decision at the third formal level, also

12  referred to as the director's level, is not appealable and will

13  conclude a prisoner's administrative remedy.  Cal. Code Regs. tit.

14  15, §§ 3084.1(a) and 3084.5(e)(2).  A California prisoner is required

15  to submit an inmate appeal at the appropriate level and proceed to

16  the highest level of review available before filing suit.  Butler v.

17  Adams, 397 F.3d 1181, 1183 (9th Cir. 2005); Bennett v. King, 293 F.3d

18  1096, 1098 (9th Cir. 2002).

19       The PLRA exhaustion requirement creates an affirmative

20  defense that a defendant may raise in an unenumerated Rule 12(b)

21  motion.  Wyatt v. Terhune, 315 F.3d 1108, 1117-19 & nn.9 & 13 (9th

22  Cir. 2003), cert. denied sub nom. Alameida v. Wyatt, 540 U.S. 810

23  (2003).  The defendant bears the burden of raising and proving the

24  absence of exhaustion.  Wyatt, 315 F.3d at 1119; Zarco v. Burt, 355

25  F. Supp. 2d 1168, 1172 (S.D. Cal. 2004).  "In deciding a motion to

26  dismiss for a failure to exhaust nonjudicial remedies, the court may

1  look beyond the pleadings and decide disputed issues of fact." <u>Id.</u>

2  at 1119-20. "I[f] the district court looks beyond the pleadings to a

3  factual record in deciding the motion to dismiss for failure to

4  exhaust – a procedure closely analogous to summary judgment – then

5  the court must assure that [the prisoner] has fair notice of his

6  opportunity to develop a record." <u>Id.</u> at 1120 n.14. If the district

7  court concludes that the prisoner has not exhausted administrative

8  remedies on a claim, "the proper remedy is dismissal of the claim

9  without prejudice." <u>Id.</u> at 1120. <u>See also McKinney</u>, 311 F.3d at

10 1200-01 (concluding that it would undermine attainment of

11 congressional objectives to permit a prisoner to exhaust

12 administrative remedies while proceeding with a federal suit).

13       Here, it is undisputed that plaintiff Leffel's inmate

14 appeal was denied at the second level of review in July of 2004 and

15 plaintiff Salinas's second level denial was issued in September of

16 2004. Defendants merely assert in conclusory fashion that plaintiffs

17 then abandoned their administrative appeals and did not present their

18 grievance to the third formal level of review. Other than citing,

19 without explanation, records documenting the second level denial

20 provided by SATF's custodian of records (<u>see</u> Defs.' Statement of

21 Undisp. Facts, Ex. E at 1, 15-20 and 36-37), defendants offer no

22 evidence demonstrating that plaintiffs Leffel and Salinas failed to

23 exhaust the third level of review.[3]

24 /////

25
26       [3] No declaration has been submitted by the Appeals Coordinator
   at the institution.

1    On the other hand, plaintiff Leffel has submitted a

2  declaration signed under penalty of perjury stating that he received

3  a second level denial on July 9, 2004, and promptly filed a third

4  level appeal on July 21, 2004.  The declaration sets forth the

5  address to which that final appeal was mailed and states that he

6  received no response thereto.  (Decl. of Daniel Leffel in Opp'n to

7  Defs.' Mot. at 1.)  Plaintiff Salinas also has submitted a

8  declaration signed under penalty of perjury stating that while his

9  second level denial occurred in September of 2004, he did not receive

10 notice of it until January 3, 2005.  (Decl. of Marvin Salinas in

11 Opp'n to Defs.' Mot. at 2-3.)  He then immediately filed a third

12 level appeal on January 9, 2005, only to have it returned accompanied

13 by a letter dated March 21, 2005, explaining that the appeal was

14 untimely because it was not filed within fifteen days of the decision

15 being challenged (i.e., the second level denial in September of

16 2004).

17    Defendants have filed no response to plaintiffs'

18 declarations and the version of events set forth therein.  Defendants

19 have simply failed to carry their burden of establishing plaintiffs'

20 failure to exhaust the available administrative remedies.[4]  The

21 defendants' motion to dismiss will therefore be denied.

22

23    [4] On this record it would appear that defendants' failure to
   timely respond to the grievances filed by plaintiffs Leffel and
24 Salinas rendered any further administrative remedy unavailable.  See
   Hemphill v. New York, 380 F.3d 680, 687 n.6 (2d Cir. 2004)(collecting
25 cases from various circuits recognizing proposition that
   institution's failure timely to respond renders administrative
26 remedies unavailable).

## II.   The Merits of Plaintiffs' Claims

The court now turns to the merits of plaintiffs' claims. Defendants have mounted a minimal defense in this regard, opting instead to litigate these motions on the many technical grounds addressed above.   Nevertheless, the court will now address plaintiffs' free exercise and free speech claims to the extent they concern the prisoners' right to receive materials from JCPM at SATF and JCPM's right to send religious materials to prisoners incarcerated at SATF.   The court will then address the prisoner plaintiffs' claims that the defendants' approved vendor policy also violates the provisions of RLUIPA.

### A.   Plaintiffs' First Amendment Claims

"Prisoners do not forfeit all constitutional protections by reason of their conviction and confinement in prison." Bell v. Wolfish, 441 U.S. 520, 545 (1979).   A prisoner "retains those First Amendment rights that are not inconsistent with his status as a prisoner." Pell v. Procunier, 417 U.S. 817, 822 (1974).   Among the rights retained are the "protections afforded by the First Amendment [citation omitted], including its directive that no law shall prohibit the free exercise of religion." O'Lone v. Estate of Shabazz, 482 U.S. 342, 348 (1987). See also Cruz v Beto, 405 U.S. 319, 322 n.2 (1972).   However, the right to exercise one's religion "is necessarily limited by the fact of incarceration, and may be curtailed in order to achieve legitimate correctional goals or to

/////

/////

21

1   maintain prison security."[5]  O'Lone, 482 U.S. at 348.  See also

2   Turner v. Safley, 482 U.S. 78, 89-91 (1987); McElyea v. Babbitt, 833

3   F.2d 196, 197 (9th Cir. 1987).  In particular, a prisoner's

4   constitutional right to free exercise of religion must be balanced

5   against the state's right to limit First Amendment freedoms in order

6   to attain valid penological objectives such as rehabilitation of

7   prisoners, deterrence of crime, and preservation of institutional

8   security.  Pell, 417 U.S. at 822-23.

9        The Supreme Court has established the following standard

10  for balancing a prisoner's constitutional rights with legitimate

11  correctional goals:  "[W]hen a prison regulation impinges on

12  prisoners' constitutional rights, the regulation is valid if it is

13  reasonably related to legitimate penological interests."  Turner, 482

14  U.S. at 89.  See also Prison Legal News, 397 F.3d at 699.  When a

15  prisoner challenges a regulation and correctional officials seek to

16  justify the regulation on the basis of a legitimate penological

17  interest, the court must determine whether the regulation is

18  reasonably related to the penological interest asserted.  Id.  In

19  making such a determination, courts consider four factors:

20          First, there must be a valid, rational connection
            between the prison regulation and the legitimate
21          governmental interest put forward to justify it,
            and the governmental objective itself must be a
22          legitimate and neutral one.  A second
            consideration is whether alternative means of
23          exercising the right on which the regulation

24  ─────────────

25      [5] The First Amendment, made applicable to the states by the
    Fourteenth Amendment, prohibits the making of laws "respecting an
    establishment of religion, or prohibiting the free exercise thereof."
26  U.S. Const. amend. I.

1            impinges remains open to prison inmates.  A third
           consideration is the impact accommodation of the

2            asserted right will have on guards, other
           inmates, and the allocation of prison resources.

3            Finally, the absence of ready alternatives is
           evidence of the reasonableness of a prison

4            regulation.

5 Allen v. Toombs, 827 F.2d 563, 567 (9th Cir. 1987) (citing Turner,

6 482 U.S. at 89-91).  See also Thornburgh v. Abbott, 490 U.S. 401, 413

7 (1989) (holding that the Turner test applies to a prison's regulation

8 of incoming mail); O'Lone, 482 U.S. at 349-50; Prison Legal News, 397

9 F.3d at 699.

10      The plaintiff prisoners' First Amendment right to receive

11 mail, and JCPM's right to send that mail to prisoners at SATF, "is

12 subject to 'substantial limitations and restrictions in order to

13 allow prison officials to achieve legitimate correctional goals and

14 maintain institutional security.'"  Prison Legal News, 397 F.3d at

15 699 (quoting Walker v. Sumner, 917 F.2d 382, 385 (9th Cir. 1990)

16 (citations omitted).  In order for defendants' approved vendor policy

17 to survive plaintiffs' free speech claims, it thus must be

18 "reasonably related to legitimate penological interests" as

19 determined by applying the Turner four-factor test.  Prison Legal

20 News, 397 F.3d at 699.

21      Here, there is no serious dispute that the approved vendor

22 policy impinges on plaintiffs' free exercise and free speech rights.

23 With respect to materials from plaintiff JCPM, there is no common-

24 sense connection between a legitimate objective and the approved

25 vendor policy.  Thus, by establishing that the plaintiff prisoners

26 have not been allowed to receive free religious materials from

plaintiff JCPM under the policy, plaintiffs have satisfied any
initial burden they may bare.  <u>See</u> <u>Prison Legal News v. Cook</u>, 238 F.
3d 1145, 1150 (9th Cir. 2001); <u>Frost v. Symington</u>, 197 F. 3d 348, 357
(9th Cir. 1999).  In response, defendants have offered no evidence of
a legitimate governmental interest justifying the policy.  While the
court can imagine hypothetical scenarios in which incoming mail
purporting to be religious materials might pose safety or security
concerns, defendants have submitted no such evidence.[6]  Moreover,
defendants do not contend that the religious literature, audio tapes
and compact discs in and of themselves raise any security concern.
For example, defendants do not contend that tape recordings and
compact discs can be fashioned into weapons.[7]  Rather, as long as the
source of the materials is approved, under this policy prisoners can
possess them.  Nor do defendants argue that the penological goals of
preventing receipt of contraband, reducing fire hazards, increasing
efficiency of random cell inspections or enhancing prison security
justify the policy.  Presumably defendants do not advance these
justifications because the Ninth Circuit has rejected such assertions
in similar cases involving non-subscription bulk mail and catalogs;
subscription non-profit mail; and subscription for-profit mail.  <u>See</u>
<u>Prison Legal News</u>, 397 F.2d at 699-700.

---

[6]  This is most likely due to the fact that plaintiff JCPM is
undisputedly a legitimate religious organization and that no such
safety or security concerns exist with respect to the materials it is
attempting to send to the prisoner plaintiffs.

[7] In any event, any such claim would be belied by the fact that
there is not an outright ban on such materials under the approved
vendor policy.

1   Rather, defendants appear to contend that religious

2   literature, audio tapes and compact discs from unapproved vendors

3   create some unspecified concern simply because they are from

4   unapproved vendors.  No evidence before the court even suggests that

5   the distinction between an approved vendor and an unapproved vendor

6   such as JCPM, is a meaningful one.  Defendants have not presented

7   evidence addressing any criteria an organization must meet to become

8   an approved vendor under their policy.  One thing is clear, plaintiff

9   JCPM cannot be an approved vendor under the policy because it

10  provides its religious materials to those who request them free of

11  charge.  Under these circumstances, defendants have failed to

12  establish that their distinguishing between approved vendors and

13  unapproved vendors is anything but arbitrary.

14  A regulation cannot be sustained where the logical

15  connection between the regulation and the asserted goal has not been

16  demonstrated, and the legitimacy and neutrality of the governmental

17  objective has not been shown.  <u>Turner</u>, 482 U.S. at 89-90.  Here, the

18  court finds that defendants' approved vendor policy is not reasonably

19  related to legitimate penological interests.  Because this first

20  <u>Turner</u> factor "'constitutes <u>sine</u> <u>qua</u> <u>non</u>,'" the court need not reach

21  the remaining three factors since the regulation at issue is not

22  rationally related to a legitimate and neutral governmental

23  objective.  <u>Prison Legal News</u>, 397 F.3d at 699 (quoting <u>Walker v.</u>

24  <u>Sumner</u>, 917 F.2d 382, 385 (9th Cir. 1990)).  <u>See also</u> <u>Ashker v.</u>

25  <u>California Dept. of Corrections</u>, 350 F.3d 917, 922 (9th Cir. 2003).

26  /////

1   While it is unnecessary to address the other <u>Turner</u> factors in light

2   of the conclusion reached above, the undersigned will do so briefly.

3          Defendants claim that the gifts and donations procedure

4   offers prisoners an alternative means of accessing religious

5   materials subject to the approved vendor policy.  As noted above,

6   because the defendants have failed to establish that the policy is

7   reasonably related to legitimate penological interests, the

8   availability of alternative avenues by which prisoners may exercise

9   their First Amendment rights is irrelevant.  Moreover, the proffered

10  alternative avenue is inadequate.  The possibility that a prisoner

11  may be able to borrow a copy of an audio cassette or compact disc

12  from a chaplain for a short period of time subject to the demands of

13  others who may desire the same recording, is not an adequate

14  replacement for possessing it indefinitely and having access to it

15  when desired.  The nature of religious worship, which is often

16  engaged in at specific times such as upon waking in the morning,

17  prior to meals and before retiring to bed, highlights the arguable

18  inadequacy of the offered alternative.  Moreover, the undisputed

19  evidence shows that JCPM teaches Christians about the Christian faith

20  through written and audio media.  JCPM only sends materials

21  specifically requested and as an exercise of its religious obligation

22  to reach out and directly connect with other Christians to propagate

23  the Christian faith and encourage Christians to conform to the

24  principles of Christianity.  Accordingly, the gifts and donations

25  procedure also does not appear to provide an adequate alternative

26  means of exercising the First Amendment rights of all the plaintiffs

1  and upon which the approved vendor policy impinges.  See Morrison v.

2  Hall, 261 F. 3d 896, 904 (9th Cir. 2001) (availability of radio and

3  television found not to be an adequate alternative to receiving

4  newspapers and magazines).

5       The third Turner factor focuses on the impact that

6  accommodating the asserted right will have on guards, prisoners and

7  on the allocation of prison resources.  Because defendants have made

8  no showing in this regard, consideration of this factor favors

9  plaintiffs.  Finally, the fourth Turner factors requires the court to

10 consider whether the existence of easy and obvious alternatives

11 indicates that the challenged regulation is an exaggerated response

12 by prison officials.  Here, this factor strongly favors plaintiffs.

13 Defendants have changed their policy three times in two years.  They

14 claim to be currently accommodating plaintiffs with respect to

15 unbound study guides, pamphlets and softbound books sent to prisoners

16 by plaintiff JCPM.  As noted above, defendants allow cassette

17 recordings and compact discs to enter the prison as long as they are

18 from one of six approved vendors.  No reason has been given as to why

19 defendants could not maintain a list of non-profit organizations from

20 which prisoners could receive such religious materials free of

21 charge.  However, even though there is no meaningful distinction

22 between plaintiff JCPM and those on the approved vendor list, JCPM is

23 prohibited from sending its religious materials to the prisoner

24 plaintiffs.

25       For the reasons set forth above, the court finds that the

26 approved vendor policy cannot survive plaintiffs Leffel, Salinas,

1  Marchy and JCPM's free exercise and free speech challenges.  Summary

2  judgment will be entered in favor of plaintiffs on these claims.

3  ### B.   Prisoners' RLUIPA Claims

4        The plaintiff prisoners also claim that the approved vendor

5  policy violates the terms of RLUIPA.  That statute provides in

6  relevant part:

7              No government shall impose a substantial burden
             on the religious exercise of a person residing in
8              or confined to an institution . . ., even if the
             burden results from a rule of general
9              applicability, unless the government demonstrates
             that imposition of the burden on the person - -

10
             (1) is in furtherance of a compelling government
11             interest; and

12             (2) is the least restrictive means of furthering
             that compelling government interest.
13

14  42 U.S.C. § 2000cc-1.

15        RLUIPA is "the latest of long-running congressional efforts

16  to accord religious exercise heightened protection from government-

17  imposed burdens."  Cutter v. Wilkinson, 544 U.S. 709, 714 (2005)

18  (holding that RLUIPA "does not, on its face, exceed the limits of

19  permissible government accommodation of religious practices").  See

20  also Guru Nanak Sikh Society of Yuba City v. County of Sutter, 456

21  F.3d 978, 985 (9th Cir. 2006).  In Cutter, the Supreme Court noted

22  that Congress enacted RLUIPA after documenting, "in hearings spanning

23  three years, that 'frivolous or arbitrary' barriers impeded

24  institutionalized persons' religious exercise."  544 U.S. at 716.

25  The Court found that the Act "alleviates exceptional government-

26  created burdens on private religious exercise" and "protects

28

1   institutionalized persons who are unable freely to attend to their

2   religious needs and are therefore dependent on the government's

3   permission and accommodation for exercise of their religion." Id. at

4   720-21.  The Court noted congressional anticipation "that courts

5   entertaining complaints under § 3 would accord 'due deference to the

6   experience and expertise of prison and jail administrators.'" Id. at

7   717.

8          RLUIPA replaces the "legitimate penological interest"

9   standard articulated in Turner v. Safley, with a "compelling

10  governmental interest" and "least restrictive means" tests.

11  Warsoldier v. Woodford, 418 F.3d 989, 994 (9th Cir. 2005).  For

12  purposes of RLUIPA, "religious exercise" includes "any exercise of

13  religion, whether or not compelled by, or central to, a system of

14  religious belief."  42 U.S.C. § 2000cc-5(7)(A).  The statute must be

15  "construed in favor of a broad protection of religious exercise, to

16  the maximum extent permitted" by the Act and the Constitution.  42

17  U.S.C. § 2000cc-3(g).  Individuals may assert a violation of RLUIPA

18  as a claim or defense in judicial proceedings and obtain appropriate

19  relief.  42 U.S.C. § 2000cc-2(a).

20         Under RLUIPA, plaintiffs bear the burden of demonstrating

21  that the institution's policy places a substantial burden on the

22  exercise of their religious beliefs.  Warsoldier, 418 F.3d at 994.

23  The focus of this initial inquiry is on how plaintiffs' religious

24  exercise is impacted, rather than on the reasonableness of the

25  facility's policy or regulation.  If the plaintiffs establish a prima

26  facie case of a substantial burden on the exercise of their religion,

29

the burden shifts to the defendants to prove that any substantial

burden is both in furtherance of a compelling governmental interest

and is the least restrictive means for furthering that interest.  Id.

at 995.

While RLUIPA does not define the term "substantial burden,"

the following analysis provides guidance:

> Because RLUIPA is a statute of relatively recent
> vintage, there is little precedent interpreting
> its key terms.  However, because the Religious
> Freedom Restoration Act (RFRA) and early free
> exercise jurisprudence imposed the requirement
> that plaintiffs demonstrate a "substantial
> burden" on their exercise of religion, those
> cases decided under RFRA and under the pre-Smith
> regime provide some guidance as to the meaning of
> this pivotal, but open-ended, statutory term.
> See Marria v. Broaddus, 200 F. Supp. 2d 280, 298
> (S.D. N.Y. 2002) (adopting precedent interpreting
> "substantial burden" under RFRA in applying
> RLUIPA); Charles v. Verhagen, 220 F. Supp. 2d 937
> (W.D. Wis. 2002) (same).  Under the case law, it
> is established that a substantial burden "must be
> more than an inconvenience."  Bryant v. Gomez, 46
> F.3d 948, 949 (9th Cir. 1995) (quoting Graham v.
> C.I.R., 822 F.2d 844, 850-51 (9th Cir. 1987),
> aff'd sum nom. Hernandez v. Commissioner, 490
> U.S. 680, 699, 109 S. Ct. 2136, 104 L. Ed. 2d 766
> (1989).  The Supreme Court, however, has
> articulated the substantial burden test
> differently over the years.  See Lyng v.
> Northwest Indian Cemetery Protective Ass'n, 485
> U.S. 439, 450-51, 108 S. Ct. 1319, 99 L. Ed. 2d
> 534 (1988); Thomas v. Review Bd. of Ind.
> Employment Sec. Div., 450 U.S. 707, 718, 101 S.
> Ct. 1425, 67 L. Ed. 2d 624 (1981); Sherbert v.
> Verner, 374 U.S. 398, 404, 83 S. Ct. 1790, 10 L.
> Ed. 2d 965 (1963).
>
> In Lyng, the Court declared that for a
> governmental regulation to substantially burden
> religious activity, it must have a tendency to
> coerce individuals into acting contrary to their
> religious beliefs.  485 U.S. at 450-51, 108 S.
> Ct. 1319; see also, Thomas, 450 U.S. at 717-18,
> 101 S. Ct. 1425 (holding that a substantial

1   burden exists where the government "puts pressure
    on an adherent to modify his behavior and to
2   violate his beliefs."). Conversely, a government
    regulation does not substantially burden
3   religious activity when it has only an incidental
    effect that makes it more difficult to practice
4   the religion. Id.; Thiry v. Carlson, 78 F.3d
    1491, 1495 (10th Cir. 1996). Thus, for a burden
5   on religion to be substantial, the government
    regulation must compel action or inaction with
6   respect to the sincerely held belief; mere
    inconvenience to the religious institution or
7   adherent is insufficient. Jolly v. Coughlin, 76
    F.3d 468, 477 (2d Cir. 1996).

8

9   Guru Nanak Sikh Society of Yuba City v. County of Sutter, 326 F.

10  Supp. 2d 1140, 1151-52 (E.D. Cal. 2003), aff'd 456 F.3d 978, 985 (9th

11  Cir. 2006). Thus, "a 'substantial burden' on 'religious exercise'

12  must impose a significantly great restriction or onus upon such

13  exercise." Guru Nanak Sikh Society, 456 F.3d at 988 (quoting San

14  Jose Christian College v. City of Morgan Hill, 360 F.3d 1024, 1034

15  (9th Cir. 2004)).

16      With respect to plaintiffs' RLUIPA claims, the defendants'

17  position is essentially that plaintiffs cannot meet their initial

18  burden of establishing that the approved vendor policy places a

19  "substantial burden" on the exercise of their religious beliefs. The

20  plaintiff prisoners, however, have submitted declarations

21  demonstrating that they are sincere adherents of the Christian faith

22  who are confined and indigent and therefore dependent on the free

23  materials provided by JCPM to exercise their religion in the hope of

24  self-improvement as a general matter and conforming to prison

25  guidelines governing behavior in particular. (Decl. of Daniel Marchy

26  in Supp. of Mot. for Summ. J. at 2-3; Decl. of Daniel Leffel in Supp.

1   of Mot. for Summ. J. at 2-3; Decl. of Marvin Salinas in Supp. of Mot.

2   for Summ. J. at 2-3.)   Without access to the materials provided by

3   JCPM at no cost, the plaintiff prisoners are unable to engage in

4   conduct that is motivated by their sincere religious beliefs and is

5   important to them.   (Id.)   These declarations have not been

6   controverted by defendants in any way.   Moreover, it is undisputed

7   that the unique study and worship materials provided by JCPM are

8   unavailable through any of the approved vendors.

9         The limitations of the gifts and donations procedure, as

10  discussed above, do not reduce this burden to a mere inconvenience.

11  Being denied access to these religious materials compels inaction

12  with respect to studying the Bible, listening to sermons and

13  Christian music and propagating and teaching others about the

14  Christian faith, all of which the undisputed evidence establishes as

15  core elements of plaintiffs' Christian faith.   Thus, the undisputed

16  evidence demonstrates that the restrictions imposed by the authorized

17  vendor policy place a substantial burden on the exercise of

18  plaintiffs' religious beliefs.   Finally, defendants have offered no

19  evidence in support of any assertion that the approved vendor policy

20  is in furtherance of any compelling governmental interest, much less

21  that it is the least restrictive means for furthering any such

22  interest.   Therefore, the approved vendor policy also cannot survive

23  the prisoner plaintiffs' RLUIPA challenges.   Summary judgment will be

24  entered in favor of plaintiffs on these claims as well.

25  /////

26  /////

1          **CONCLUSION**

2          Accordingly, IT IS HEREBY ORDERED that:

3          1.   Defendants' motion to dismiss pursuant to Federal Rule

4   of Civil Procedure 12(b) is denied;

5          2.   Defendants' motion for summary judgment is granted with

6   respect to defendant Woodford and denied in all other respects;

7          3.   Plaintiffs' motion for summary judgment is granted in

8   part and denied in part to the extent set forth above;

9          4.   A status conference is **SET** for **November 3, 2006,** at

10  **11:00 a.m.**   At that time the parties shall be prepared to discuss how

11  to proceed so as to aid in resolution of this case including, but not

12  limited to, the scheduling of the case.

13  DATED: September 27, 2006.

14

15                              _____
                                DALE A. DROZD
16                              UNITED STATES MAGISTRATE JUDGE

17  DAD:th
    ddad1\orders.consent\jesus0440.msj.order.v3
18

19

20

21

22

23

24

25

26